# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

GARY FRANKS,               )          CASE NO. 5:11CV701

                     )

                     )

          PLAINTIFF,       )          JUDGE SARA LIOI

                     )

vs.                        )

                     )          **MEMORANDUM OPINION**

VILLAGE OF BOLIVAR, et al.,    )

                     )

                     )

          DEFENDANTS.    )

Before the Court is defendants' motion for summary judgment (Doc. No. 44),[1] plaintiff's opposition (Doc. No. 55),[2] and defendants' reply (Doc. No. 61). For the reasons discussed below, the motion is **GRANTED**.

## I. BACKGROUND

### A.     Procedural Background

On March 9, 2011, plaintiff Gary Franks ("plaintiff" or "Franks") filed this action in the Tuscarawas County Court of Common Pleas against the Village of Bolivar, Ohio ("the Village") and its mayor, Rebecca Hubble ("Hubble") (collectively, "defendants"). Hubble was sued in both her official and individual capacities. The complaint alleged claims of age discrimination under Ohio Rev. Code § 4112.02(A), First Amendment retaliation, breach of

---

[1] In support of the motion, defendants also filed plaintiff's responses to defendants' interrogatories and requests for production of documents (Doc. No. 45) and numerous deposition transcripts (Doc. Nos. 47-51), along with the deposition exhibits (Doc. No. 52).

[2] Franks has attached an affidavit to his opposition brief. To the extent it contradicts his deposition testimony, it will not be considered by the Court. *Telerico v. Nationwide Mut. Fire Ins. Co.*, No. 12-2209, 2013 WL 3455481, at *4 (6th Cir. July 9, 2013) ("the well-worn rule in the Sixth Circuit is that '[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony'") (alteration in original) (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)).

contract, abuse of power, and intentional infliction of emotional distress. Defendants removed the action due to the First Amendment claim and subsequently moved for partial judgment on the pleadings. On November 18, 2011, ruling on defendants' motion, the Court dismissed Count III (breach of contract) and Count IV (abuse of power), as well as any claim for punitive damages against the Village and Hubble in her official capacity. Count I (age discrimination), Count II (First Amendment retaliation), and Count V (intentional infliction of emotional distress) are the remaining counts in the complaint. Defendants now move for summary judgment on all three counts.

**B.      Factual Background**

Franks had been employed as the Water and Street Superintendant ("Superintendent") for the Village since 1977. (Franks Dep. [Doc. No. 47] at 232.) This position was an appointed position, requiring annual reappointment by the Village Council at the mayor's recommendation. (*Id*. at 238-39; Hubble Dep. [Doc. No. 50] at 877.) Franks was reappointed virtually every year (except when "they forgot" − Hubble Dep. at 877)[3] until in or around January 2011, when he was not reappointed. (*Id*. at 858, 877-80.)[4] At that time, he was converted from a salaried worker to an hourly worker and his pay was reduced to reflect the fact that he was no longer the Superintendent (Hubble Dep. at 906, 908; Franks Dep. at 315); however, he continued to do the exact same job duties as he had prior to his not being reappointed. (Hubble Dep. at 874.) On February 11, 2011, the Village Council voted to offer Franks a retirement package. (Doc. No. 52-11; Franks Dep. at 308-09.) Franks was under the impression that he had been given time to consider the offer. (Franks Dep. at 312.) However, before he could return

---

[3] Franks claims that it was just "[a]ssumed by everybody[ ]" that he would be reappointed. (Franks Dep. at 240.)

[4] Hubble had taken office in February 2010. (Hubble Dep. at 771.)

with his response, following a vote by the Village Council at a meeting on February 21, 2011, his employment with the Village was terminated by way of a letter he found on his desk the following morning. (*Id.* at 262;[5] Hubble Dep. at 914; *see also* Doc. No. 52-31.)

Franks claims these employment actions were a result of age discrimination and a form of retaliation for his having spoken out about Village issues, in particular his view that the Village could not afford a full-time police chief[6] and his opposition to the institution of a time clock. He further claims that his non-reappointment intentionally caused him to suffer severe emotional distress over the prospect of losing his job and his benefits. Defendants assert that Franks was not reappointed as the Superintendent (although he was initially retained as an employee of the Street and Water Department) and was eventually terminated (but then allowed to retire) because of his conduct and his attitude of insubordination toward his superior, the Mayor.

## II. DISCUSSION

### A.    Summary Judgment Standard

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[5] Franks characterized this official termination letter as a "note." (Franks Dep. at 262.)

[6] At his deposition, Franks testified that, during the term of the previous mayor, Pat White, he had spoken to Maria App, a Village council person, about his belief that the Village, with a population of 800, could not afford a full-time policeman, specifically referring to the position of police chief. App, who had asked for Franks's opinion on the issue, "[a]pparently . . . didn't like what she asked me for, [taking it] as if [Franks] was against the police." (Franks Dep. at 301-02.) Franks also testified that he told Hubble, before she was mayor, "about [App] and Pat White and the police chief sitting in this office over here for three, four hours a day and four, five days a week," which, "as a taxpayer, not as a superintendent," he thought was "pretty much wasting my money that a police officer sits in the Village hall with a councilman and the mayor for hours and hours and hours." (*Id.* at 304-05.)

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina College v. Russell*, 499 U.S. 225 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he

trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

**B.      Analysis**

   **1.      Count I - Age Discrimination under Ohio Rev. Code § 4112.02(A)**

   Ohio Rev. Code § 4112.02 provides, in relevant part: "It shall be an unlawful discriminatory practice: (A) For any employer, because of the . . . age . . . of any person, to discharge without just cause, . . . or otherwise to discriminate against that person with respect to . . . tenure, terms, conditions, or privileges of employment[.]"[7]

   The Ohio Supreme Court has held that:

   absent direct evidence, to establish a prima facie violation of R.C. 4112.14(A) a plaintiff "must demonstrate (1) that he or she was a member of the statutorily protected class, (2) that he or she was discharged, (3) that he or she was qualified for the position, and (4) that he or she was replaced by, or that the discharge permitted the retention of, a person not belonging to the protected class." *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 575 N.E.2d 439, syllabus (explaining and modifying paragraph one of the syllabus in *Barker,* 6 Ohio St.3d 146, 6 OBR 202, 451 N.E.2d 807). This test is a descendant of *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668, in which the United States Supreme Court promulgated an analytical framework for claims of race discrimination.

---

[7] Ohio Rev. Code § 4112.14(A) identifies persons over the age of 40 as the class protected against age discrimination.

*Coryell v. Bank One Trust Co., N.A.*, 101 Ohio St. 3d 175, 177 (2004) (footnote omitted) (an age discrimination case).

Where this four-part *McDonnell-Douglas* test is used, once the prima facie case is established by a preponderance of the evidence, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If defendant carries that burden, the presumption of discrimination created by the prima facie case is rebutted, the presumption drops from the case, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993), and plaintiff, who retains the burden of persuasion, must prove that the articulated reason was not the true reason for the employment decision, but was merely a pretext for discrimination. *Burdine*, 450 U.S. at 253. "But a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515 (emphases in original).

When a "direct evidence standard" is relied upon, "an employee must prove a causal link or nexus between evidence of a discriminatory statement or conduct and the prohibited act of discrimination to establish a violation." *Byrnes v. LCI Commc'n Holdings Co.*, 77 Ohio St. 3d 125, 130 (1996). Direct evidence "is evidence other than the four-part demonstration of *Barker*." *Id*. at 128-29 (citing *Kohmescher*, *supra*). It is "evidence which, if believed, proves the existence of improper discrimination animus without inference or presumption. . . . Evidence either of statements made by non-decision makers or of statements made by decision-makers that are not related to the decisional process itself do not satisfy the plaintiff's burden of demonstrating direct evidence of discriminatory [intent]." *Shepard v. Griffin Servs., Inc.*, No. 19032, 2002 WL 940110, at *3 (Ohio Ct. App. 2d Dist. May 10, 2002) (internal

6

quotation marks and citations omitted). "Specifically, isolated or ambiguous discriminatory remarks are insufficient to support a claim for discrimination." *Id.* at *4.

Plaintiff claims he can establish age discrimination under both the indirect and direct methods. The Court will begin with the indirect method.

It is undisputed that plaintiff meets the first three elements of a prima facie case of age discrimination. Defendants make no argument with respect to the fourth element, moving directly to an argument that they had a legitimate, nondiscriminatory reason for their employment decisions. Plaintiff asserts, without any reference to the record, that he was "replaced by a thirty something worker[.]" (Opposition [Doc. No. 55] at 1342.)[8] For purposes of this analysis, therefore, the Court will assume that plaintiff has established a prima facie case of age discrimination, shifting the burden of production to defendants to articulate a legitimate, nondiscriminatory reason for not reappointing Franks as the Superintendant and for then terminating his employment altogether.

To meet this burden, defendants assert that Franks had developed an attitude of insubordination, evidenced specifically by four verbal and/or written disciplines that he received between June and November 2010, which led to the decision in January 2011 not to reappoint

---

[8] The record shows that, roughly around the time plaintiff was not reappointed as Superintendent, a new position of Village Administrator was created to take the place of the Board of Public Affairs, which was eliminated. According to Hubble, this had been discussed as far back as 2007 (when she was on the Village Council), but had never been acted upon. (*See generally* Hubble Dep. at 862-67.) The person initially hired for that new position, John "Mike" Heil, was apparently in his thirties, possessed a "water license" and had experience as a water operator. (Hubble Dep. at 887; Heil Resume [Doc. No. 52-15] at 1255-57.) Hubble conceded that Heil was brought in because she was "preparing for terminating Mr. Franks." (Hubble Dep. at 889.) Heil was a temporary hire; he was replaced as the Village Administrator by Mark Haueter, who was in his late twenties or early thirties. (Hubble Dep. at 931-32.) Haueter did not have any water experience or certification (*see* Haueter Resume [Doc. No. 52-15] at 1258-59); he was told, before he was hired, that he would be required to obtain "water board certification." (Hubble Dep. at 930-31.) After Haueter assumed the role of Village Administrator, Heil became the "water operator." (Hubble Dep. at 897, 931.)

him as Superintendent. Thereafter, the situation escalated, resulting in Franks being offered a retirement package, and eventually being terminated in February 2011.

Plaintiff's first verbal warning related to Hubble's observation of Franks's 14-year-old grandson operating the Village's lawn mower in June 2010. Hubble told Franks not to let his grandson operate the equipment until she could check with the Village attorney. Shortly thereafter, Hubble confirmed with the attorney that the youth could not operate any Village equipment. When Hubble told Franks not to let his grandson operate the mower again, she claims Franks responded: "I'm going to pretend like I didn't hear that[,]" (Hubble Dep. at 831), although he denies ever doing so (Franks Dep. at 294-95). Hubble advised that she would "write [Franks] up" if she saw it again. (Hubble Dep. at 831.) After that conversation, Hubble made a trip to Virginia and, while there, she received a telephone call from her office to the effect that a resident had observed a young man on the Village mower and had called to inquire when he had been hired. When Hubble returned from her trip, she gave Franks a verbal warning (Hubble Dep. at 831-33), although Franks had no recollection of receiving the reprimand (Franks Dep. at 292-93).

Plaintiff was also given a verbal reprimand on August 2, 2010[9] regarding his conduct with respect to a village resident, Frank Lunsford. (*See* Doc. Nos. 52-18, 52-19.) On or about June 21, 2010, Lunsford had come to Hubble's office to speak with her and the police chief regarding a couple issues. After their conversation, Lunsford mentioned that, on several occasions, he had seen Franks just sitting in his vehicle at the pump house for several hours. Lunsford wondered why Franks was not working when he was on Village time. (Hubble Dep. at

---

[9] It is not clear why this was considered a "verbal" reprimand, since it is quite clearly in writing. (*See* Doc. No. 52-18.) However, whether it was verbal or written is not material to the legal analysis.

758-60.) Franks happened to be in a nearby restroom with the door open and he heard Lunsford. Franks angrily came into Hubble's office saying: "That's a lie. That's a lie. You know that's a lie." (*Id.* at 762.) Franks, who was "very upset and very agitated" was "pointing at Mr. Lunsford." (*Id.* at 762, 834.) The police chief testified that Franks was red-faced, was "[s]pitting mad," and that "[t]here was a lot of screaming and yelling[.]" (Haugh Dep. [Doc. No. 51] at 1182-83; *see also* Doc. No. 52-2 at 1230.) The chief was concerned about Lunsford, who was on oxygen, and wanted Franks to "[c]alm down" because "the guy was sucking through his oxygen[.]" (*Id.* at 1184.) Hubble "had to vividly tell [Franks] to stop it, to leave the room[ ]" because he was "very, very upset." (Hubble Dep. at 835.)  Franks admits he twice called Lunsford "a liar" (Franks Dep. at 285, 287), and that Hubble "didn't appreciate that I guess." (*Id.* at 286.) Franks's son, who was also a Village employee, witnessed the event and even he told his father that he "got a little bit loud." (*Id.* at 344.)

Franks's third discipline relates to his actions at a Village Finance Committee meeting on August 30, 2010, at the time Hubble was instituting the use of a time clock for employees. (*See* Doc. Nos. 52-20 to 52-26. ) Hubble had particular concerns about the amount of overtime Franks was earning and felt there needed to be more accountability. (Hubble Dep. at 809-11, 825.) The bottom line was that, during the Finance Committee meeting where the time clock was discussed, Franks became "very, very angry, very, very angry," and refused to clock in and out or to be called out for emergencies if he was going to be expected to use the time clock. (*Id.* at 844.) In Franks's view, Hubble inappropriately found him insubordinate for simply "ask[ing the] question" about "who was going to call [him] out in emergencies if [he] had to punch a time clock." (Franks Dep. at 269.) He does not think he got loud or angry, but admits that others may have thought he was angry because he got "animated." (*Id.* at 274-75.)

9

Plaintiff's fourth disciplinary action resulted from his actions with another Village employee -- a bus driver who had apparently reported to a police officer that some low-hanging branches on a street near the school needed trimming. The officer must have attended a Safety Committee meeting and relayed the driver's concern. After the Committee told plaintiff to address the issue of the branches, plaintiff went to the driver to ask if he was the one who had complained and to inform him that, in the future, he should just tell Franks directly, not go to the Council. Part of this conversation was recorded on a police cruiser video camera by an officer who was monitoring the school zone. (Haugh Dep. at 1148-50.) The video was turned over to the mayor's office (Hubble Dep. at 850) and it apparently showed Franks yelling at the bus driver, which Franks denies. (Franks Dep. at 289-90; *see also* Doc. No. 52-2 at 1231.) As a result of this incident, "per council request," Franks was given a written warning for "[i]nsubordination, including but not limited to, refusal or failure to perform work assignment and the use of profane or abusive language to supervisors, employees or officers of the village, and absence from duty without notice or permission of the supervisor." (Doc. No. 52-28; *see also* Hubble Dep. at 843.)

Because of these four incidents, which happened in a short space of time, Hubble and the Village Council decided not to reappoint Franks as the Superintendent. (Hubble Dep. at 860.) Prior to making that decision, during the December council meeting the Council and the Mayor discussed a possible termination, but the Mayor's preference was for "something else to happen besides that." (*Id*. at 853.) In particular, she preferred to see Franks retire, since "on numerous occasions" he had told her he was "looking to retire probably sometime at the end of the year [2011]." (*Id*. at 859.) At the time of those discussions with Franks, Hubble had no problem with him working through the end of 2011. (*Id*. at 860.)

10

By December 2010 or January 2011, however, "[t]hings had escalated . . . and [Franks] was very agitated a lot of times when he came to work." (*Id*. at 876.) "[H]e could be very hateful to [Hubble and] [a]t one point [she] had the door slammed in [her] face by [Franks]. It was not a good working relationship." (*Id*. at 876-77.) Sometimes when Hubble gave Franks a directive, "he would walk off in a huff, and then he wouldn't do it[.]" (*Id*. at 915.) She acknowledged thinking, at the time they were planning to hire a Village Administrator, that, "if things continued as they [were], there [was] a possibility that Mr. Franks would no longer be employed with the village." (*Id*. at 889.)[10] There is no evidence that Hubble ever formally reprimanded Franks for this rude behavior.[11]

One of the ways that matters had escalated following Franks's demotion was that others, in particular Maria App and Chief Haugh, were complaining that Franks had begun

---

[10] Hubble also testified that, after she became mayor, she met frequently with Franks. During those meetings, she "explained to [him] how [she'd] like things done[.]" (Hubble Dep. at 877-78.) She asked him to tell her if there were any major problems; but she "would never get any form of communications. [Franks] very rarely said anything to [her] in regards to what was going on." (*Id*. at 878.)

Franks acknowledged that the previous mayor "was very inactive" and that "[Mayor Hubble] had, apparently, her own way of thinking how things were to run and they were different from the ways things had run in the past[.]" (Frank Dep. at 255.) When Hubble took office, "at first it was not much change, but then she kept changing with the idea that [Franks] was doing everything wrong[.]" (*Id*. at 256.) Hubble testified that she had noticed that Franks and his son, Dave (who was also a Village employee), did everything together. For example, if someone needed to go to the store to buy a part for something, they would both go. She told Franks that he and his son had "separate duties" and "shouldn't be riding around together." (Hubble Dep. at 920.) Franks never complied with this directive, although Hubble admits she never wrote him up for it. (*Id*. at 921.)

Franks further acknowledged that he was fired because he "was written up numerous times for things[.]" (*Id*. at 264.) However, he characterized the incidents for which he was disciplined as "very trivial." (*Id*.)

[11] Defendants do not seem to rely on these particular factual assertions as support for their adverse employment decision, so the Court need not be concerned about whether they are true, a matter that would be better left to a jury, since plaintiff was not questioned at his deposition about any of this alleged behavior. That said, the Court also notes that a person's mere protected-class status does not insulate him from adverse employment actions. If an employee were to repeatedly get very angry at his boss, slam doors in her face, ignore her directives, and otherwise act in a rude and insulting fashion, that employee can expect negative consequences. An employee who would fail to stop that conduct when warned about it, just because he does not agree with the employer's judgment as to the severity of the conduct, can even expect to be terminated. No employer is required to tolerate bad behavior, even from a longtime employee who otherwise does his job satisfactorily. *See, e.g.*, *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1183-84 (6th Cir. 1997) (it is appropriate to distinguish between a discharge on the basis of misconduct and discharge on the basis of some otherwise protected status); *Keith v. Ashland, Inc.*, 205 F.3d 1340 (6th Cir. 2000) (Table) (civil rights statutes "do[ ] 'not insulate one from the consequences of one's actions'") (quoting *Mararri*).

harassing them and following them, even taking pictures of them. (Haugh Dep. at 1099-1118; App Dep. [Doc. No. 48] at 545-49; *see also* Doc. No. 52-1; Doc. No. 52-2 at 1232-35.) On February 15, 2011, Hubble advised Franks in writing, and put a note in his personnel file, that he was not to follow Haugh or any member of council and must refrain from being in or near their residences. (*See* Doc. No. 52-30; Hubble Dep. at 995, 1007.) Franks denies that he ever followed or stalked anyone (Franks Dep. at 264-65; 288), and asserts that he just happened to be in the neighborhood each time they saw him, because his drive to the pump house took him past App's home (*id*. at 358-59). In an affidavit attached to his opposition brief, Franks belatedly asserts that he has "multiple witnesses that he was at the high school helping with sports teams during that time." (Aff. [Doc. No. 55-1] ¶ 8.)[12] However, the police chief testified that photographs found on a camera in Franks's city truck show that he *was* photographing Haugh and App. (Haugh Dep. at 1098-1101.)

It is clear from this record that defendants have met their burden of producing a legitimate, nondiscriminatory reason for Franks's termination, namely, that he had developed an escalating attitude of insubordination and had begun harassing other Village employees.

Plaintiff argues that defendants' reason is no more than a pretext for age discrimination. He argues that the reprimands and write-ups he received were insufficient to motivate his demotion and/or termination, and that they came immediately after Maria App

---

[12] Apparently the Village Council, in 1986, had given approval for Franks to leave work and go to the local high school during football season to wrap the ankles of the football players. This occurred three days a week from about 3:00 to 3:30. (Franks Dep. at 296.) Franks claims that he kept track of the time away and would offset it against the time he spent checking the pump house on weekends or going to committee meetings. (*Id*. at 297-98.) Hubble had concerns that this privilege was being taken advantage of and that the time away from his work was not being made up and/or accounted for. This was one reason she wanted to institute use of a time clock. (Hubble Dep. at 810-11.)

conducted a salary comparison in August 2010, which revealed that Franks's salary was "significantly higher" than that of other employees. (*See* App Dep. at 472-74, 480.)[13]

Plaintiff's assertions of pretext are unsupported by the record. To establish pretext, plaintiff has to first prove the falsity of the reason given by defendants. *St. Mary's Honor Ctr.*, *supra.* As has been noted already, plaintiff does not deny that the incidents for which he was reprimanded occurred; he merely discounts their importance or severity. Therefore, plaintiff fails this half of the test for pretext.

In addition, to prove pretext, plaintiff must show that the reasons given by the defendants were not the real reason, but that age was actually their reason for taking the adverse employment actions. *St. Mary's Honor Ctr.*, *supra.* Even though all four of his official reprimands occurred chronologically after App had performed the cost analysis of employees' salaries, this is not proof of age discrimination. Plaintiff's burden is to prove that "age . . . actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." *Blandford v. Exxon Mobil Corp.*, 483 F. App'x 153, 157-58 (6th Cir. 2012) (alteration in original; internal quotation marks omitted).

The Supreme Court has stressed that "the very essence of age discrimination [is] for an older employee to be fired because the employer believes that productivity and competence decline with old age." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). In other words, age discrimination is "based in large part on stereotypes unsupported by objective fact[.]" *EEOC v. Wyoming*, 460 U.S. 226, 231 (1983). Therefore, "[a]ge discrimination plaintiffs

---

[13] App was a Village Council member. She was originally appointed to council in early 2003 and subsequently won the office by election. (App Dep. at 418-19, 420.) She and Franks were "personal friends" at one time and "had a very good working relationship." (App Dep. at 434.) In 2010, App decided to do the salary analysis of every Village employee for an eleven-year period for the purpose of understanding "how the money is budgeted in [the] village." (App Dep. at 472, 480.)

must establish that they were discriminated against because they were old, not because they were expensive." *Blandford*, 483 F. App'x at 159 (internal quotation marks and citation omitted). In *Hazen Paper*, the Court held that it was not age discrimination to fire an employee to prevent his pension from vesting,[14] "since the employee's cost, rather than his age, motivated the firing[.]" *Lyon v. Ohio Educ. Ass'n & Prof. Staff Union*, 53 F.3d 135, 138 (6th Cir. 1995). Therefore, even if Franks were terminated because the Village Council and the Mayor discovered that his salary was significantly higher than others, this, without more, would not constitute *age* discrimination.

Notably, Franks does not deny the factual basis of any of the four formal reprimands;[15] in fact, although he puts a somewhat different spin on each, he acknowledges that each incident occurred.[16] His personal opinion as to whether they were serious or specific enough to warrant termination is in no way dispositive, nor does it create a material factual

---

[14] Even though such a firing, without more, did not constitute age discrimination, the Court noted that it "[did] not mean to suggest that an employer *lawfully* could fire an employee in order to prevent his pension benefits from vesting[ ] [because] [s]uch conduct is actionable under § 510 of ERISA[.]" *Hazen Paper*, 507 U.S. at 612 (emphasis in original).

[15] Franks argues that "the write-ups . . . are insufficient to motivate a discharge because they were too vague to credibly support insubordination as a justification for Plaintiff's termination." (Opposition at 1343.)

Franks attacks the August 2, 2010 write-up relating to the June 21, 2010 Lunsford incident, arguing that it could be "more specific[.]" (*Id.*) Even a cursory review of that write-up reveals that it is quite detailed. Even so, plaintiff argues that Hubble "wanted to have this warning to thwart accusations of unlawful age discrimination or retaliation[.]" (*Id.*) Notably, he does not deny the incident.

Franks attacks the November 10, 2010 write-up relating to the August 31, 2010 bus incident as containing only "boilerplate language" that is "too imprecise to use as support for bad behavior justifying termination." (*Id.*) He argues that Hubble's two-month delay in documenting this incident suggests that, "upon taking notice of Plaintiff's age in [App's salary] Comparison, [Hubble] wrote Plaintiff up so she could use insubordination as a pretext for firing him." (*Id.*) Again, he does not deny the actual incident.

Finally, he attacks the February 15, 2011 warning placed in his employment file directing him not to harass or follow the police chief or any council person. He alleges, based on his own self-serving affidavit (presumably at ¶ 8, although he does not provide a pinpoint citation), and on a non-supporting reference to his deposition at page 102 [Page ID # 330] lines 14-21, that "the proffered reasons for Plaintiff's termination have no basis in fact, and/or were insufficient to motivate a discharge[.]" (*Id.* at 1344.) Although Franks denies any factual basis for this write-up, this is not actually one of the four reprimands relied upon by the defendants. This write-up relates to the purportedly "escalating" behavior following his demotion from Superintendent.

[16] Plaintiff does deny that he followed or stalked other employees. However, the entire record suggests that, even before complaints of such harassment were made, there were already thoughts of terminating Franks's employment because of his recent repeated insubordination toward the Mayor. (Hubble Dep. at 889.)

dispute precluding summary judgment. *See Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996), quoted by *Coulter v. Deloitte Consulting, L.L.C.*, 79 F. App'x 864, 868 (6th Cir. 2003) ("[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance[]").

Plaintiff also asserts that he can prove age discrimination directly.[17] He cites *Scott v. Potter*, 182 F. App'x 521 (6th Cir. 2006) for the proposition that (1) Hubble's conversations with him about retirement, including her alleged offer to throw him a retirement party, (2) Hubble's alleged statement that Franks should go work on a farm, and (3) Hubble's assertion that she had projects to accomplish that Franks could not do, are "nothing but a proxy for age[,]" that is, direct evidence of age discrimination. (Opposition at 1344-45.)

Hubble testified that, as of December 2010, she did not necessarily want Franks to retire; however because of all the problems, she thought retirement would be better than termination, a possibility already being discussed by the Village Council. (Hubble Dep. at 840, 841, 853-54.)[18] In fact, Hubble claims that Franks approached *her* several times after she became mayor to talk about retirement, wanting her to know that he was thinking about retiring at the end of 2011, when he could get his full PERS benefits. (*Id*. at 858-59.)

---

[17] Franks's particular argument in this regard is somewhat self-defeating. He argues that "[all] the evidence described above [for the indirect, burden-shifting analysis] also qualifies as direct evidence of [d]efendants' age discrimination against [p]laintiff because *reasonable inferences* can be made from the words and comments that there is a genuine issue of material fact precluding summary judgment." (Opposition at 1345, emphasis added.) Direct evidence, by definition, requires that no inferences need be drawn.

[18] Maria App confirmed that the Council's "whole goal was to either . . . bring things into compliance . . . [and], if that didn't happen, give him an option, either retire, resign, you have your integrity, and it doesn't exploit anything in town as to what our concerns are." (App Dep. at 530-31.)

Franks testified that, because of all the executive sessions he was not part of,[19] he "had an idea" that they were discussing his termination "because of the reprimands[.]" (Franks Dep. at 310.) He approached the Mayor "[o]ne night after council meeting [to] ask[ ] her what the situation was[.]" (*Id.* at 309.) He claims Hubble said that "we would really like for you to retire." (*Id.*) She purportedly told him "she had big projects that she wanted to accomplish and she didn't think [he] could do those." (*Id.*) She "offered [him] a big party if [he] would retire [and] [s]he said [he] could go work on the farm." (*Id.*)[20]

Franks never asked Hubble what "big projects" she was referring to (Franks Dep. at 313) and, at his deposition, he admitted he could not recall any occasion when Hubble told him not to proceed with a project he had proposed during their regular meetings, which he said occurred weekly (*id.* at 280-81). Hubble says that she and Franks had only one conversation about a project, the "trail project," which entailed pouring concrete, a job that was always contracted out to others. (Hubble Dep. at 934; *see also* Franks Dep. at 245, acknowledging that contractors did all paving projects.) In fact, as far as job performance goes, Hubble testified that Franks "did it to the best of his ability." (*Id.*) She had no complaints about "the actual job performance[.]" (*Id.*)

As noted above, Franks claims that these incidents did not amount to "stray workplace remarks, because there was an ongoing theme with respect to his age and being due for retirement." (Opposition at 1346.) He claims, under *Scott*, *supra*, that these incidents constitute a proxy for age and, as such, are direct evidence of age discrimination. In *Scott*, the court explained the concept of "proxy" as follows:

---

[19] Under the previous mayor, Pat White, Franks had apparently participated in at least some of the executive sessions of Council. (*See* Franks Dep. at 311 -- "After Pat White I was never invited to an executive session.")

[20] This was apparently a reference to a farm held in a Franks family trust. (Franks Dep. at 318-19.)

> For example, an employer might routinely use a facially innocuous term like "experienced" to refer to an older worker in a disparaging way. If there was evidence of such routine usage, then a statement like "Let's fire him; he's too experienced" would be direct evidence of age discrimination. *Cf. Hazen Paper*, 507 U.S. at 612-13, 113 S.Ct. 1701. This is because no factual inference of discrimination need be drawn from the statement, only a translation need be applied -- *i.e.*, "experienced" means "too old" to that particular employer. Here, though, [plaintiff] has offered no evidence that the defendants use "retire" as a proxy for "too old" or some other derogatory, age-based term. *See Erickson*, 271 F.3d at 725 (affirming summary judgment where plaintiff failed to show that the defendant used length of tenure as a proxy for age).

*Scott*, 182 F. App'x at 526. The court in *Scott* cited *Erickson*, where plaintiff had been demoted due to poor performance. His superior purportedly said that he "should have moved five years ago" because "twenty years is too long." *Erickson v. Farmland Indus., Inc*., 271 F.3d 718, 723 (8th Cir. 2001). The court upheld the district court's grant of summary judgment in favor of the employer on plaintiff's age discrimination and retaliation claims. It held that plaintiff's reliance on these statements as a proxy for age "require[d] an inference, and the comment therefore does not directly reflect an attitude of discrimination based on age." *Id*. at 725. The remarks that plaintiff was "stale" and "set in his ways" were deemed by the court to be legitimate business concerns when evaluating a salesman's performance. It held that "only by inference could we leap from these remarks to a conclusion that [plaintiff's superior] was really talking about [plaintiff's] age rather than his effectiveness as a salesman." *Id*.

Similarly, in Franks's case, the record supports a conclusion that, since he had served the Village for over thirty years, when issues of insubordination suggested that termination might be warranted, the Village and Hubble preferred to offer him the opportunity to retire, especially in light of the fact that he had already voluntarily discussed his retirement as being imminent. Only by inference could one conclude from any of the three examples given by Franks that these were really references to his age.

17

Franks has simply not met his burden, either directly or indirectly, of showing that defendants' termination of his employment was based on age. Accordingly, defendants are entitled to summary judgment in their favor on Count I (age discrimination).

### 2. Count II -- First Amendment Retaliatory Discharge[21]

In Count II, plaintiff alleges that he had engaged in protected speech under the First Amendment and "did not share in all of the views of the Mayor." (Compl. ¶ 64.) He alleges that he "wanted his benefits due and owing to him and would not accept less or a payment plan just because the Village had used the monies in which [sic] were owed to him." (*Id*. ¶ 66.) He further alleges that he "suffered adverse employment actions due to his speech and/or his request to have his benefit monies[.]" (*Id*. ¶ 67.) He alleges his employment was terminated "because of his speech that was in opposition to various policies and practices of [d]efendants[,]" (*id*. ¶ 68), and "because he voiced his opinion that the Village refused to pay his benefit monies, which were due and owing to him because they did not have his money on hand." (*Id*. ¶ 69.)

Although Count II alleges these specific facts, relying on plaintiff's response to an interrogatory, defendant's motion narrows the scope of this claim. Defendants posed Interrogatory No. 9 to plaintiff as follows:

> For all speech for which you believe you were retaliated against by the Village or Mayor Hubble, identify
>
> a. What you said;
> b. Who was present;
> c. When you said it; and
> d. Where you said it.

(Doc. No. 45-1 at 220.) In response to the interrogatory, plaintiff stated:

---

[21] Although the complaint makes no mention of 42 U.S.C. § 1983, presumably Count II is brought under that statute for actions taken in violation of the First Amendment under color of state law.

18

> Answer: Objection. The subject matter is better suited for deposition. Without waiving objection, all statements relative to the management and cost of the police department. All statements made during finance committee meetings in regards to the time clock issue and reprimands.

(*Id*.) Defendants state in their motion that "[p]laintiff identified two incidents of speech which he believes resulted in his termination." (Motion at 206.) Defendants then address their motion solely to these two examples of free speech: plaintiff's expressed opinions about the Village police department, more specifically, whether there was need for a full-time policeman for a village of 800 residents, and plaintiff's comments at the Finance Committee meeting relating to the institution of a time clock for employees.

Plaintiff, in his opposition brief, has notably not objected to defendants' narrowing of the issues in the complaint, but has simply responded in like fashion solely to the two issues identified by defendants. The Court, therefore, concludes that plaintiff has waived the broader allegations in his complaint and is now confining his First Amendment retaliation claim to these two matters.

First Amendment retaliation claims, like age discrimination claims, are analyzed under the *McDonnell-Douglas* burden-shifting framework. "A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: '(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.'" *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir.2006)). "If the employee establishes a prima facie case, the burden then shifts to the

employer to demonstrate 'by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'" *Id.* (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (internal quotation marks omitted)). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.* at 294-95 (internal citation and quotation marks omitted). "Unlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Id.* at 295.

With respect to plaintiff's speech relating to the Village police department, defendants argue that he cannot establish the third element of a prima facie case. As to his speech relating to the time clock, defendants assert that it was not protected speech. The Court will address each argument.

Defendants argue that it is not enough that an adverse employment action followed the protected speech; plaintiff must prove a link between the speech and the adverse action. *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 144-45 (6th Cir. 1997). To prove this link, plaintiff must show "that the speech was a 'substantial' factor -- a 'motivating' factor -- in the employer's decision to terminate his or her employment." *Id.* at 144 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "[T]he employee must point to specific, nonconclusory allegations reasonably linking [his] speech to employer discipline." *Id.* (internal quotation marks and citations omitted). "That is, [plaintiff] must present evidence

sufficient to create a genuine issue that [his] speech *caused* [his] discharge." *Id*. at 145 (emphasis in original).[22]

Here, as in *Bailey*, plaintiff is unable to "present evidence of evidentiary quality that demonstrates the existence of a genuine issue of material fact." *Id*. at 145 (citations omitted). Here, as in *Bailey*, plaintiff "points to no actions or comments by the named defendants that would raise a genuine issue that [his] protected speech was a substantial or motivating factor in the decision to dismiss [him]." *Id*. Franks himself admits that the substance of his speech (a conversation with App relating to whether or not a police department was needed in the Village) actually occurred during the tenure of the previous mayor. He then declares, in conclusory fashion: "Later, during Mayor Hubble's tenure, Maria App and Mayor Hubble tangled with [p]laintiff again over the use of police resources, as evidenced by the Mayor's write up on February 15, 2011, in which she wrote ' . . . you are not to harass or follow . . . the Chief of Police.'" (Opposition at 1349-50.) He goes on: "The timing of these incidents suggests a long standing difference of opinion regarding the use of police resources." (*Id*. at 1350.)

There is *nothing* in this record, *including the timing* of the incidents, to suggest that plaintiff was fired because he expressed an opinion in 2007 or 2008, during the previous mayor's term, that he did not think the Village needed or could afford a full time police chief. By his own testimony, he "had no conversations with the sheriff or anybody else [about the police chief issue] after that point." (Franks Dep. at 306-07.) The February 15, 2011 written warning quoted by plaintiff relates to allegations that he was harassing and stalking the chief of police,

---

[22] The court in *Bailey* noted that, although "[o]rdinarily, causation is a question to be resolved by a jury[,] . . . [a] court may nevertheless grant summary judgment on the issue of causation when warranted." *Bailey*, 106 F.3d at 145 (citing *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988); *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996)).

allegations that were reasonably supported by pictures from the camera in his own truck. There is no connection between this 2011 warning and the conversations that took place in 2007 or 2008.

Plaintiff's second example of free speech retaliation relates to his vocal opposition to the introduction of a time clock. As to this example, defendants argue that it does not fall under the category of protected speech.

"When a public employee sues a government employer under the First Amendment Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern." *Borough of Duryea, Pa. v. Guarnieri*, 131 S.Ct. 2488, 2493 (2011) (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)). "If an employee does not speak as a citizen, or does not address a matter of public concern, 'a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.'" *Id.* (quoting *Connick*, 461 U.S. at 147). "Even if an employee does speak as a citizen on a matter of public concern, the employee's speech is not automatically privileged. Courts balance the First Amendment interest of the employee against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.,* 391 U.S. 563, 568 (1968)).

The Court does not agree with defendants' assertion that this was not a matter of public concern. Franks was obviously voicing his opinion about the time clock, particularly as it related to his time on weekends going out to check on the pump house and to the times he was called out in emergencies, out of concern that this would be a waste of time (and, thus, taxpayer money). Since this was a concern regarding wise use of Village resources, it certainly was a matter of public concern. However, the causation element is missing here because Franks was

22

not disciplined because he disagreed with using a time clock. His reprimand resulted from the fact that he got "very, very upset," "visibly upset," when discussing the matter (Hubble Dep. at 843, 845), directing his anger at the Mayor, his superior, and going so far as telling her that he simply would not use the time clock (*Id.* at 845, 847). No matter how important this discussion may have been in the grand scheme of public concerns, Franks was not free to affront his superior in that public setting (or for that matter, in any setting), nor was he free to direct anger at her, nor was he free to refuse her directive to use a time clock, all under a rubric of "free speech." Even though he was, undoubtedly, free to voice his opinion on this subject, he was not free to do so in any manner he chose, no matter how offensive.

Plaintiff has failed to meet his burden of showing that he was terminated from his position with the Village in retaliation for his exercise of his First Amendment free speech rights. Accordingly, defendants are entitled to summary judgment on Count II (First Amendment retaliation).

### 3.     Count V-- Intentional Infliction of Emotional Distress

In Count V, plaintiff alleges that defendants "acted intentionally when [they] fired [p]laintiff without cause when he was on the verge of retirement and collecting his long accumulated retirement benefits." (Compl. ¶ 84.) He alleges that defendants "knew or should have known that [p]laintiff would suffer serious emotional distress as a result of being fired in the Village, publicly discussed as an employee with problems, tapings of the [p]laintiff without his consent, following him during his job duties by council and the police chief and disparaging comments of throwing a big party if he would leave, or told to work on the farm." (*Id.* ¶ 85.) He alleges that these actions constitute intentional infliction of emotional distress.

In Ohio, a person is liable for intentional infliction of emotional distress when he or she "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another[.]" *Kovacs v. Bauer*, 80 Ohio St. 3d 1224, 1227 (1998) (dissent) (noting that the tort was first recognized in *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 6 Ohio St. 3d 369 (1983), when the court "adopted the standard established in 1 Restatement of the Law 2d, Torts (1965) 71, Section 46(1)").[23] For conduct to be considered "extreme and outrageous," it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency[.]" *Yeager*, 6 Ohio St. 3d at 375.

"[A] wrongful termination of employment in itself is not sufficient to give rise to a claim for intentional infliction of emotional distress unless the conduct accompanying the discharge is extreme and outrageous conduct by defendants." *Browning v. Navistar Intern. Transp. Corp.*, No. 91AP-1286, 1992 WL 112618, at *4 (Ohio Ct. App. May 19, 1992).

Here, Count V of plaintiff's complaint substantially alleges no more than that he was terminated before he could enjoy the full scope of his retirement benefits and that defendants knew this would cause him severe emotional distress. This, by itself, is insufficient to establish the tort.[24] Loss of his benefits was merely a consequence of loss of his employment. Even if the loss of his employment were deemed wrongful (which it is not), the wrongful termination alone would not constitute the separate tort of intentional infliction of emotional distress.

Plaintiff's complaint also alleges that he (and his wife, who is not a party) was humiliated by his being fired after public discussions at Village Council meetings. Although, by

---

[23] *Yeager* was abrogated on other grounds by *Welling v. Weinfeld*, 113 Ohio St. 3d 464 (2007).

[24] Franks does not allege that he was anything other than an at-will employee. Under Ohio law, "[u]nless otherwise agreed, either party to an oral employment-at-will employment agreement may terminate the employment relationship for any reason which is not contrary to law." *Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100 (1985), syllabus. Loss of one's job will undoubtedly always cause some distress. That fact does not convert the loss into an actionable tort.

plaintiff's own testimony, most of the discussions took place in executive sessions of the Village Council, by necessity, certain decisions must be made on the public record. This does not constitute the tort of infliction of emotional distress, even though it undoubtedly was distressing to plaintiff.

In his opposition brief, plaintiff argues that, in addition to this public humiliation, defendants inflicted emotional distress upon him when they "had a police officer follow him, tape-recorded his conversations without his knowledge, badgered him to retire, made disparaging and hostile remarks about retirement and going to live on the farm, nitpicked his work day schedule and time keeping procedures, reduced his pay, and *then* fired him[.]" (Opposition at 1354, emphasis in original.) These incidents, even if true, would not rise to the level of "extreme and outrageous" conduct and no jury would disagree.

### III. CONCLUSION

For the reasons set forth herein, summary judgment is granted in favor of the defendants on all of plaintiff's remaining claims.[25]

**IT IS SO ORDERED**.

Dated: September 18, 2013

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[25] Because of this determination, the Court need not address any question of immunity.